**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **United States of America ex rel.**<br>**DEMOND COLE,** )<br> )<br> ) | |
| **Petitioner,** ) | |
|  ) | |
| **vs.** ) | **Case No. 12 C 4591** |
|  ) | |
| **MARCUS HARDY, Warden,** )<br>**Stateville Correctional Center,** )<br> ) | |
| **Respondent.** ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

An Illinois jury convicted Demond Cole[1] of first degree murder and attempted murder. The trial judge sentenced him to prison terms totaling seventy-one years. Cole has petitioned this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

In his petition, Cole asserts six claims. Respondent contends that two of these claims are not cognizable in a federal habeas corpus petition, one of the claims is procedurally defaulted, and the state courts reasonably decided the remaining three claims on their merits. In his reply, Cole concedes that two of his claims are not cognizable in this case.

For the reasons stated below, the Court denies Cole's petition.

---

[1] The Court will refer to Demond Cole as "Cole" but, to avoid confusion between family members involved in this case, the Court will refer to several other individuals by their first names.

## Background

### A.    State court proceedings

#### 1.    The shooting and Cole's trial

Cole admits that he shot Terrence Turentine (Terrence) on September 15, 2001 at approximately 1:30 a.m., while Terrence was driving a 1985 GMC van near the corner of 87th Street and Martin Luther King Drive.  Terrence's uncle, Larry Turentine (Larry), and his friend, known only as "K.D.," were also in the van but were not hurt in the shooting.  Cole contends that Terrence was shooting at Cole's vehicle, a 1980 Chevrolet Caprice, and that he shot at Terrence's van in self-defense.

Cole's trial began with jury selection on April 26, 2004.  Early that same morning, the prosecution sought to amend the charge of attempted first degree murder. Specifically, it asked to change the language in the original indictment that accused Cole of having "shot Larry Turentine about the body" to language accusing him of having "shot at Larry Turentine . . ."  Ex. S at A-6–A-7; Ex. P at C-38.  Defense counsel objected, arguing that the proposed amendment was a substantive change to the charge and that only a grand jury could appropriately amend the indictment.  The trial judge overruled defense counsel's objection, concluding that the amendment comported with the testimony at the grand jury proceedings held in October 2001.

At Cole's trial, Larry Turentine testified that Terrence was driving south on Martin Luther King Drive with Larry and K.D. when he was forced to stop because Cole's Chevy Caprice and another car were stopped in the street and were blocking both lanes.  According to Larry, the road was too narrow to drive around the cars, so Terrence waited for a few minutes and then "started blowing the horn because they

continued to talk." Ex. T at C-44. Cole turned around and smiled at the van but did not move his car. After Terrence honked the van's horn again with no response, he tried to maneuver the van around the Caprice.

Larry testified that Cole refused to let the van pass his car. As the van accelerated southbound to pass the cars, Cole began to drive southbound as well, just beside the van. Cole pulled ahead and began swerving back and forth in the road in an apparent attempt to prevent the van from passing him. Terrence slowed down, but Cole slammed the brakes of his car, forcing Terrence to hit the back of the Caprice. Cole again accelerated and continued southward down King Drive past 87th Street. Terrence turned left onto 87th Street and drove eastward. He drove for approximately one block when he, Larry, and K.D. noticed that Cole had turned his car onto 87th Street and was a half-block behind them. When Terrence saw the Caprice, he made a U-turn on 87th Street to face Cole's car, which was still headed eastbound.

As Cole's car came closer to the van, Larry saw that there was another person in the car. Larry testified that as Cole drove past the van, he "pulled a gun out and leaned back . . . and started firing in the van." *Id.* at C-54–C-55. Larry testified that one of the bullets hit Terrence in the back of the head, and he immediately fell toward the middle of the car. K.D. took the wheel and drove toward Provident Hospital. At some point along the way, Larry spotted a police car. Larry testified that he "told the police that [his] nephew had just got[ten] shot" but did not receive any response from the police officers. *Id.* at C-59. K.D. and Larry got back into the van and continued toward Provident Hospital. They arrived at the hospital at approximately 1:30 a.m. on September 15. Terrence died a few hours later from the gunshot wound. K.D. left the hospital at some

point soon afterward, and as of the time of Cole's trial, the prosecution could not locate him.

Felicia O'Neal, who in September 2001 was dating Cole's brother, Joseph Cole (Joseph), also testified. According to O'Neal, Cole came to Joseph's house on September 15 at approximately 1:30 a.m., carrying a gun in his hand. He put the gun under the mattress in an adjoining room where he was staying and told Joseph that he had been in a car accident. O'Neal testified that she, Joseph, and Cole all went outside to inspect the car. The prosecutor showed O'Neal photographs of the Chevy Caprice and O'Neal testified that they accurately depicted how the car appeared on September 15.

According to O'Neal, while they were outside, Cole twice told Joseph and O'Neal that he had killed someone and laughed. Cole told them that he needed to "get out of here," and he left the house. *Id.* at C-162. O'Neal testified that someone eventually removed the gun from under the mattress but that she could not remember who removed it.

On cross-examination, O'Neal admitted that she did not contact the police about the events of September 15 until Joseph was taken into custody in October 2001. O'Neal also stated that when she and Joseph went outside to inspect the Caprice, she noticed a half-inch hole in the back window of the car.

Detective Robert Myers testified about his investigation regarding the September 15 shooting. According to Myers, Terrence's aunt, Laverna Turentine, called him in early October 2001 with information about the shooting. After speaking with her and subsequently interviewing Larry Turentine, Myers gathered information regarding the

Chevy Caprice that Cole had been driving the night of the shooting. Myers learned that the vehicle was registered to Joseph and brought Joseph to the police station for questioning. Myers called Larry to view a line-up that included Joseph. When Larry viewed the line-up, he "stated that Joseph Cole resembled the person who had shot and killed Terry Turentine." Ex. V at E-26. After speaking with both Joseph and O'Neal, Myers testified, he went to Joseph's house to look for Cole and Ezra Washington, the other individual who had been in the Chevy Caprice with Cole on the night of the shooting. On October 13, Myers detained both Cole and Washington and questioned them about the shooting. The police also impounded the Chevy Caprice.

Myers testified that police conducted a custodial search of the two men and found approximately six grams of cannabis in Washington's possession. They arrested Washington and charged him, but he was never convicted of any crime involving the cannabis. During his trial testimony, discussed in further detail below, Washington denied possessing any cannabis. He stated that he was released from custody as soon as he testified against Cole before the grand jury and that the police told him not to "worry about" those charges. Ex. U at D-134.

Shortly after taking Cole into custody, Myers arranged for Larry to return to the station and view another line-up—this time with Cole in the line-up rather than his brother. Myers testified that Larry identified Cole as the shooter. Myers also showed Larry pictures of Joseph's Chevy Caprice, which Larry identified as the car used in the shooting. When confronted with this identification, Cole denied being involved in a shooting and told the police that the Caprice had been damaged in a traffic incident the previous winter.

The prosecution also called Ezra Washington to testify. His trial testimony tended to support a claim of self-defense on Cole's part. Washington stated that he and Cole stopped on Martin Luther King Drive to talk to the driver of another car and that at some point, a van pulled up behind them headed south. He stated that the road was sufficiently wide for the van to pull around but the van's driver refused to do so and began erratically flashing the van's lights and honking the horn. According to Washington, he and Cole were confused and were scared they didn't know what the occupants of the van were doing. They drove away, but the van chased them. A few blocks later, the van bumped the Caprice so hard that it ran the Caprice off of the road and onto the sidewalk. Washington stated that Cole appeared very scared and backed the car onto the road. After they turned onto 87th Street to drive back to their neighborhood, Washington saw the van ahead of them. It made a U-turn and drove toward the Caprice. Washington testified that the van struck the Caprice. Just before impact, Washington and Cole saw that the driver of the van had a gun and was pointing it at Cole. The two men ducked. Washington stated that although he did not see Cole pick up his gun, a few seconds later Cole was shooting behind the car toward the van as they drove away. Washington testified that the back window of the car "got shot out" by an occupant of the van, not by Cole. *Id.* at D-33.

After eliciting Washington's version of events, the prosecution introduced previous statements that Washington had made that inculpated Cole and were inconsistent with Washington's trial testimony. Washington had previously given a statement to police after he was arrested, and he had also testified before the grand jury. On both occasions, Washington stated that he and Cole were sitting in the Chevy

Caprice facing southward on Martin Luther King Drive when the van tried to get around the car. In the process of that attempt and Cole's efforts to block the van, "the van bumped [Cole's] car lightly from the back . . . ." *Id.* at D-69. Cole then swerved to prevent the van from passing him, but at some point he drove onto the curb, and the van was able to pass the Caprice. The van turned east onto 87th Street, and Cole followed. The van then made a U-turn and started to head west, facing the Caprice. According to Washington's earlier statements, Cole stopped the Caprice and pulled out a handgun from under the driver's seat. As the van drove by, Cole shot at the van at least four times. The van stopped, and Cole drove away eastward on 87th Street. Washington said that Cole was the only one with a gun. He saw the bullet hole in the back window of the car, and he told police that he knew it was from Cole's gun because there were no other guns involved.

In his earlier statements, Washington said that he and Cole then drove to Joseph's house, where Cole told Joseph that he had shot the driver of the van because the van had hit the Caprice. Cole explained to Joseph that he had shot out the Caprice's back rear window during the incident. Later in the weekend, Washington overheard Cole bragging that "a guy hit his car and he shot him." *Id.* at D-119.

Washington testified on cross-examination that his earlier statement to police and his earlier grand jury testimony were false. He testified that when first arrested, he told the police that the driver of the van had a gun and began the confrontation, but the police and Assistant State's Attorney Bronwyn Sears (who initially interviewed him about the shooting) rejected his description of the incident and told him that he was going to jail. Washington wrote a few handwritten statements, which the police rejected,

but eventually a new assistant state's attorney came to visit him and took the statement that became Washington's official statement to police. Washington stated that the others were discarded.

Sears, two other assistant state's attorneys involved in the case, and Detective Myers all denied most of Washington's testimony, including his contention that he had given multiple statements while at the police station. They also all denied any attempts to influence or dictate the contents of Washington's statement in any way.

Cole did not present any witnesses in his defense. His trial counsel argued in closing argument that Cole shot at the GMC van to protect himself after seeing Terrence Turentine pointing a gun at him. Defense counsel argued that Washington had testified truthfully in court and that he lied in his earlier statements after the police repeatedly told him that they would not release him unless he inculpated Cole. Counsel argued that O'Neal's statement to police was also inaccurate and was the product of her desire to free her then-boyfriend (Joseph Cole) from police custody. Finally, counsel argued that Larry Turentine's testimony was not credible. Among the various reasons he gave for not believing Larry's account of events, counsel questioned why Terrence refused to turn onto a side street to take an unobstructed route after it became clear that Cole did not intend to allow the van to pass through. He questioned why, if the men in the van were trying to get away from the Chevy Caprice, Terrence would have made a U-turn so that he was directly facing Cole's car. Defense counsel concluded his argument as follows:

> I have argued for self-defense here, ladies and gentlemen, that the actions
> are justified on an early morning when a van turns, stops, comes back
> towards you after contact just a short time before; when a weapon is seen
> in that van as to the reason, ladies and gentlemen, I would argue that the

> van could turn around, stop, not go any place, not go to the girl's house or not go home; not go down a side street, but stop there and do their form of justice.
>
> I believe that's the proper and just verdict, that Mr. Cole used self-defense that night, and he should be found not guilty and he is not guilty of the attempt[ed] murder of Larry Turentine.

Ex. W at F-48–F-49.

The prosecution began its rebuttal argument by stating that "[a]fter an argument like that it is no wonder Chicago is the murder capital of the world." *Id.* at F-49. The trial court overruled defense counsel's objection. The prosecution repeated these types of statements throughout its rebuttal argument:

> No wonder that we have the highest rate of homicide in the world, when someone can take the position that because someone got into a traffic altercation they deserve a bullet in the brain; that someone did not make a U-turn initially and walk away, that they deserve a bullet in the brain; that they sped off and then came to a stop when this guy was chasing them, they deserve a bullet in the brain.

*Id.* The prosecutor also repeatedly referred to Cole as "Mr. self-defense" and "Mr. victim," which the record clearly suggests was sarcasm. *Id.* at F-51, 71. The prosecutor characterized defense counsel's argument as "incredible" and "offensive[.]" *Id.* at F-61. He argued in conclusion to the jury that "this is not a true self-defense case. This is a 26th street self-defense case." *Id.* at F-52.

Both immediately before closing arguments and as part of the final jury instructions, the trial court told the jury that closing arguments are not evidence and that the jury should disregard any statement made by the attorneys that did not comport with the evidence presented at the trial.

On May 3, 2004, the jury found Cole guilty of first degree murder for the death of Terrence Turentine and guilty of attempting to commit first degree murder of Larry

Turentine.  The jury also found that Cole had discharged a firearm that proximately caused Terrence's death.

### 2.    Post-trial proceedings and appeal

On May 24, Cole's trial counsel filed a motion for a new trial.  On July 6, however, Cole retained a new attorney, who filed an additional motion for a new trial on August 31.  The trial court scheduled a hearing on the motions for September 7.  On that date, Cole apparently filed a third motion *pro se*.  In the second and third motions, Cole alleged that his trial counsel was constitutionally ineffective on a number of grounds, including counsel's alleged failure to interview and present defense witnesses on Cole's behalf.

At the hearing, Cole presented a number of witnesses who stated that they were willing to testify that Felicia O'Neal admitted she fabricated the statement she gave to police in October 2001, implying that her subsequent testimony at Cole's trial was also false.  Cole's brother Joseph stated that his testimony before the grand jury in October 2001 incriminating Cole was untrue.  He stated at the post-trial hearing that the police forced him to make those statements in exchange for allowing him to return home after depriving him of food for four days.  Joseph also testified that Assistant State's Attorney Kathleen Lanahan, who escorted him to the grand jury to testify, threatened him with jail time if he did not testify favorable for the prosecution.

Cole also called a number of witnesses who testified that they saw bullet holes in the Chevy Caprice in the days immediately following the September 15 incident. Clarence Magee, who lived near Cole, testified that there were two bullet holes in the front windshield of the Caprice, both the front and back windows on the driver's side of

the car were gone, and the back windshield was also missing.

Lawrence Wayne, who was in the car stopped next to the Caprice on King Drive on September 15, testified that although he was not present during the shooting, he saw that the Caprice had significant window damage approximately ten minutes after the shooting. Specifically, he saw that the front windshield had two bullet holes in it, both the front and back windows on the driver's side of the car were "busted out;" and the back windshield was missing. Ex. Y at N-126. On cross-examination, Wayne admitted that his memory of the night was poor. He also testified that although he saw glass inside of the car, he did not see any bullets in it.

Cole testified on his own behalf at the post-trial hearing. He testified extensively about various witnesses whom he had asked trial counsel to investigate and interview, and he stated that he consistently told counsel that he had acted in self-defense. According to Cole, there were bullet holes inside the Chevy Caprice from Terrence's gun, and a number of the windows of the car had been "shot up." *Id.* at N-43. Cole stated that he had the windows replaced in the Caprice shortly after the incident. Cole said that he relayed all of the information concerning the damage to the Caprice and the bullet holes inside the car to trial counsel, who assured Cole that he would take photographs of the car and investigate his reports.

On cross-examination, Cole admitted that there were no bullet holes on the outside of the Chevy Caprice and testified that but for the windows which he replaced, the photographs that were used in his trial accurately depicted the car's condition immediately following the shooting. Shortly after that statement, however, Cole testified that there was a bullet hole in the ceiling of the Caprice that had knocked some of the

paint off of the roof.

In response, the prosecution called ASAs Lanahan and Sears, who both testified that they never threatened Joseph to obtain incriminating testimony or suggested details to Joseph to include in his testimony. Sears further testified that while at the police station with Joseph, she never heard any police officer or detective make any threats or promises to Joseph in exchange for his statement to police.

The prosecution also called Mark Kusatzky, Cole's trial attorney, who testified that Cole never told him that there were bullet holes inside of the Chevy Caprice. According to Kusatzky, the first time he learned that Terrence Turentine may have had a gun was when he interviewed Ezra Washington shortly before the trial. Kusatzky stated that at that point, the car had already been destroyed.

The trial judge denied all three of Cole's motions for a new trial. He concluded that all of Cole's witnesses "came into this courtroom and lied in their testimony." Ex. AA at O-17. He explained that he was discrediting each defense witness's testimony based on inconsistencies between witnesses and inconsistencies within the same witness's prior signed statements. The judge accepted as credible Kusatzky's testimony that neither Cole nor any other witness had ever told him about any bullet holes in the windows of the Chevy Caprice or inside of the car.

After denying Cole's motions, the trial judge sentenced him to prison terms totaling seventy-one years. Cole appealed his conviction to the Illinois Appellate Court, asserting five grounds: (1) the trial court erred in allowing the prosecution to make improper statements during closing arguments; (2) the trial court violated his Sixth Amendment right to conflict-free counsel when it failed to inquire into a potential conflict

of interest based on trial counsel's alleged concurrent representation of Cole and his brother Joseph; (3) trial counsel was unconstitutionally ineffective when he failed to request an instruction to the jury that it could draw an adverse inference against the prosecution based on the destruction of the Chevy Caprice; (4) the trial court improperly allowed the prosecution to amend the attempted first-degree murder charge; and (5) the trial court improperly calculated the amount of credit for time that Cole had already served in custody prior to his conviction.

On September 18, 2006, the Illinois Appellate Court affirmed Cole's conviction but ordered that he be given the appropriate amount of credit for time served. Cole timely petitioned for leave to appeal to the Illinois Supreme Court on his four rejected claims. The court denied his petition in January 2007. Cole filed a post-conviction petition, alleging ineffective assistance of counsel on a number of grounds not relevant here. The Illinois state courts eventually dismissed those claims as well.

**B.      Cole's habeas corpus petition**

Cole has filed a *pro se* habeas corpus petition in this Court, asserting six claims. First, Cole contends that his due process rights were violated when the prosecutor made improper comments in his rebuttal closing argument. Second, he claims that he was denied his Sixth Amendment right to conflict-free counsel based on trial counsel's alleged representation of his brother, Joseph Cole. Third, Cole alleges that his trial counsel rendered ineffective assistance when he failed to request an instruction to the jury that it could draw an adverse inference against the prosecution for the destruction of the car Cole was driving on the night of the shooting. Fourth, he contends that he was denied due process and equal protection when the trial court allowed the

prosecution to amend the charge of attempted first-degree murder, which he argues was a substantive change that could properly be made only by a grand jury. Fifth, he alleges that the Illinois Appellate Court improperly interpreted Illinois Supreme Court Rule 651 when it decided that the rule did not apply to his privately retained counsel and his actions in preparing the post-conviction petition. Finally, Cole claims that to the extent that Rule 651 does not apply to his post-conviction counsel, that rule violates his rights to due process and equal protection.

In its answer, respondent argued that Cole's first four claims fail on the merits and that his fourth claim was not fairly presented to the state courts as a constitutional claim. Respondent contends that Cole's last two claims are based on state law and are not cognizable in a federal habeas petition. In his reply, Cole concedes that his fifth and sixth claims, concerning Illinois Supreme Court Rule 651, are not federally cognizable. The Court will address the remaining four claims in turn.

### Discussion

Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies by giving the state courts an opportunity to consider the alleged violation of his federal constitutional rights. This requires the petitioner to "fairly present" his claim to the state courts, "thereby alerting [them] to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 32 (2004); 28 U.S.C. § 2254(b)(1)(A). A petitioner who fails to properly assert a federal claim before the state courts has procedurally defaulted the claim, which means that federal court review of the claim's merits is barred unless the petitioner can demonstrate both cause for and prejudice from the default or that a miscarriage of justice will occur if the court fails to address the

claim on its merits. *See, e.g., Woods v. Scwartz*, 589 F.3d 368, 373 (7th Cir. 2009).

If the petitioner has preserved his claims for federal review, the law nevertheless precludes issuance of a writ of habeas corpus unless the state court's decision: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2). The last reasoned state court decision to address the claims in Cole's habeas corpus petition was the Illinois Appellate Court's decision on direct appeal. Thus the Court will look to that decision to assess the reasonableness of the state courts' adjudication of Cole's federal claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) (presumption that "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground").

## A. Prosecutorial misconduct

The prosecutor at Cole's trial made several inappropriate comments directed at Cole, his trial counsel, and the theory of Cole's defense. On direct appeal, the Illinois Appellate Court expressed concern about the prosecutor's comments but concluded that the trial court did not abuse its discretion in overruling Cole's objections. Ex. A at 12. Specifically, the appellate court stated that although the prosecution's arguments "verged on the boundaries of improper comment" and that although it "[did] not condone this type of argument," the arguments "reasonably relate[d] to the State's apparent strategy of discrediting defendant's theory of self-defense [and] challenging the

believability of the witnesses" *Id.* at 11–12.  The court further concluded that the trial

court's instructions to the jury—namely, the court's instruction that closing arguments

were not evidence—"neutralized the possibility of prejudice" to Cole.  *Id.* at 12.

The relevant "clearly established Federal law" here is the Supreme Court's

decision in *Darden v. Wainwright*, 477 U.S. 168 (1986).  Although the state court did not

expressly discuss *Darden* or any other federal case, this Court will uphold the state

court's decision so long as it is consistent with the reasoning of *Darden*.  *See Early v.

Packer*, 537 U.S. 3, 8 (2002) (section 2254 does not require state court to cite relevant

Supreme Court cases so long as the state court's reasoning and result do not contradict

Supreme Court precedent).  The Supreme Court recently noted that "the *Darden*

standard is a very general one" that gives state courts "'more leeway . . . in reaching

outcomes in case-by-case determinations.'"  *Parker v. Matthews*, 132 S. Ct. 2148, 2155

(2012) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 644 (2004)).

Under *Darden*, a habeas corpus petitioner must show both that the prosecutor's

comments were improper and that the statements "so infected the trial with unfairness

as to make the resulting conviction a denial of due process."  *Darden*, 477 U.S. at 181

(citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  The Court in *Darden*

looked to a number of different factors to assess whether the prosecutor's statements

ran afoul of this standard:  (1) whether the prosecutor's statements misstated or

manipulated the evidence; (2) whether the comments implicated any of the defendant's

specific rights; (3) the extent to which the defendant invited the comments; (4) the trial

court's instructions; (5) the weight of the evidence against the defendant; and (6) the

defendant's opportunity to rebut.  *Id.* at 181–82.

The state appellate court was fully warranted in expressing serious concern about the prosecutor's comments in Cole's case. The prosecutor's reference to Chicago as the "murder capital of the world" served no proper purpose; it amounted to an improper attempt to urge the jury to make a statement about a social crisis. *See, e.g., United States v. Childress*, 58 F.3d 693, 715 (D.C. Cir. 1995) ("It is well established that a prosecutor may not use the bully-pulpit of a closing argument to inflame the passions or prejudices of the jury or to argue facts not in evidence."); ABA Standards for Criminal Justice, Prosecution Function and Defense Function, Standard 3–5.8(c), p. 106 (3d ed. 1993). The prosecutor's comments likely were designed to distract the jury from its proper function, which was to decide whether the evidence properly introduced was sufficient to prove Cole's guilt beyond a reasonable doubt.

The state court's decision in Cole's case, however, was neither contrary to nor an unreasonable application of *Darden*. The prosecutor's comments did not so infect the trial with unfairness as to result in a denial of Cole's due process rights. The court found that the prosecutor's arguments "reasonably relate[d]" to a legitimate strategy. Ex. A at 11. The court also noted the trial court's instruction to the jury that closing arguments were not evidence and concluded that the instruction tended to neutralize any prejudice. These are among the relevant factors under *Darden*.

Consideration of the other *Darden* factors further supports a conclusion that the state court's determination that Cole was not denied a fair trial was reasonable. The comments did not implicate any of Cole's specific rights, and although improper, they did not misstate or manipulate the evidence produced at trial. Cole did not have an opportunity to respond to the prosecutor's comments. The state appellate court

concluded, however, that the evidence against Cole was "overwhelming," Ex. A at 9,

and this is the *Darden* factor that the Seventh Circuit has repeatedly described as the

most important one.  *See, e.g., Hough v. Anderson*, 272 F.3d 878, 903 (7th Cir. 2001);

*Pisciotti v. Washington*, 143 F.3d 296, 302 (7th Cir. 1998).  This was not an

unreasonable assessment.  Larry Turentine gave extensive testimony that incriminated

Cole, and O'Neal, a disinterested witness, testified that Cole bragged about killing

Terrence Turentine.  The only witness that testified favorably for Cole at his trial was

Ezra Washington, but his prior statements, which the prosecution introduced into

evidence, were incriminatory of Cole.  For these reasons, the Illinois Appellate Court did

not act unreasonably in rejecting Cole's claim concerning the prosecutor's arguments.

**B.    Conflict of interest**

Cole next argues that the trial court violated his constitutional rights when it failed

to inquire into trial counsel's alleged concurrent representation of both Cole and his

brother Joseph.  He contends that once Joseph testified at Cole's post-trial hearing that

Kusatzky was his attorney during the time of Cole's trial, the trial court was required to

inquire further.

The Supreme Court has held that the right to counsel includes a "correlative right

to representation that is free from conflicts of interest."  *Wood v. Georgia*, 450 U.S. 261,

271 (1981).  When a trial court knows or reasonably should know that a particular

conflict exists, it must inquire further regarding that conflict.  *Mickens v. Taylor*, 535 U.S.

162, 168–69 (2001); *Cuyler v. Sullivan*, 446 U.S. 335, 347 (1980).  Multiple

representation, however, is not a *per se* violation of the Sixth Amendment right to

counsel.  Rather, the petitioner must show that the multiple representation resulted in a

conflict that actually affected counsel's performance in his representation of the petitioner at trial. *See Mickens*, 535 U.S. at 169–71 (trial court has no duty to inquire into "vague, unspecified possibility of conflict, such as that which inheres in almost every instance of multiple representation" (internal quotation marks omitted)); *Cuyler*, 446 U.S. at 346–47 ("Absent special circumstances, . . . trial courts may assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist."). In *Wood*, the Supreme Court found a due process violation where a review of the record left the Court "[un]sure whether counsel was influenced in his basic strategic decisions" based on an apparent conflicting representation. *Wood*, 450 U.S. at 272.

The Illinois Appellate Court overruled Cole's conflict-of-interest claim. The Court found that the record did not support Cole's contention that trial counsel represented both him and Joseph. It based this conclusion on trial counsel's testimony at the post-trial hearing generally and Joseph's testimony that counsel frequently spoke with Cole's entire family about his case. The court also noted that Joseph was never formally charged in the case and was a suspect only briefly.

The appellate court's definitive conclusion that no attorney–client relationship existed between Joseph and Cole's trial counsel at any point or for any purpose during the pendency of Cole's criminal proceedings would appear to be an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(2); *People v. Simms*, 192 Ill. 2d 348, 382, 736 N.E.2d 1092, 1118 (2000) (attorney–client relationship created when client authorizes attorney to act and attorney indicates acceptance of power to act on client's behalf). This is not dispositive of Cole's

claim, however, because the relevant constitutional inquiry is whether the record suggests that there was a conflict that actually affected counsel's performance, such that the trial court should have inquired further. *Mickens*, 535 U.S. at 171; *Wood*, 450 U.S. at 272. The Court concludes that no such suggestion existed in the trial record.

Cole's trial counsel testified at the post-trial hearing that he did not believe it was in Cole's best interests for Joseph to testify and that Cole "was made aware of the reasons why [he] did not call Joseph." Ex. Z at N-237. He explained that he believed that calling Joseph as a witness "would have quite frankly opened the door for [the prosecution] to do more damage than any good, because statements that [he did not] believe did come out could have come out." *Id.* at N-238. In short, counsel clearly explained his decision not to call Joseph as a witness and rebutted any potential implication that he had a conflict of interest in his dealings with the two brothers, and the trial court expressly found that testimony credible. Neither Joseph nor Cole offered any testimony that contradicted defense counsel's testimony on this point. The record at the post-trial hearing did not sufficiently suggest a conflict of interest that actually affected trial counsel's representation of Cole such that the trial court was obliged to inquire further. The state court's rejection of Cole's claim was therefore reasonable.

## C.    Ineffective assistance of trial counsel

Cole's third claim is that his trial counsel rendered ineffective assistance when he failed to request a jury instruction based on the authorities' destruction of the Chevy Caprice. Specifically, Cole contends that under Illinois law, he was entitled to an instruction that the jury could draw an adverse inference against the prosecution based on the car's destruction after it was impounded. He contends that counsel rendered

constitutionally inadequate assistance by failing to ask the trial court to give such an instruction.

The Illinois Appellate Court identified the correct Supreme Court decision governing Cole's claim, *Strickland v. Washington*, 466 U.S. 668 (1984), and it concluded that he had not established trial counsel's constitutional ineffectiveness. Specifically, the court determined that "defense counsel was not ineffective for failing to devise a strategy based on defendant's claims that bullets struck his car in defiance of physical science." Ex. A at 16. It also noted that "defendant's claims of State spoliation of the evidence were undermined by defendant's own handling of the car after the crime." *Id.*

The Supreme Court in *Strickland* held that to prevail on a claim of ineffective assistance under the Sixth Amendment, a petitioner must show both that counsel's performance fell below an objective standard of reasonableness and that the petitioner suffered prejudice as a result. *Strickland*, 466 U.S. at 688, 694. The Court stated that courts should "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (internal quotation marks omitted); *see also Bell v. Cone*, 535 U.S. 685, 702 (2002) (strong presumption warranted because "it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight"). Regarding the standard for prejudice, a petitioner must establish that the counsel's unreasonable performance was "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Harrington v. Richter*, 131 S.

Ct. 770, 787–88 (2011) (citing *Strickland*, 466 U.S. at 687).

At the conclusion of the post-trial hearing, the trial judge concluded that defense counsel was unaware of Cole's claim that there were bullet holes inside the Chevy Caprice. Cole has offered nothing to suggest that this factual determination was unreasonable. Further, having reviewed the state court record, the Court concludes that the trial court's factual determination was reasonable. *See Morgan v. Hardy*, 662 F.3d 790, 798 (7th Cir. 2011) (petitioner may succeed in challenging state court's factual determination if it was contrary to the clear weight of the evidence in the record). Cole himself testified at the post-trial hearing that he replaced the windows on the Caprice before the police impounded his car, leaving no traces of the alleged bullet holes in the windshield. Cole also testified that, except for the replaced windows, the photographs of the Caprice that were presented at trial accurately depicted the car as it appeared on the night of the shooting.

Given these facts, trial counsel did not act unreasonably in failing to request an instruction that the jury could draw an adverse inference against the prosecution based on the car's destruction before the trial. Trial counsel, having no knowledge of any alleged bullet holes inside the car, had no basis to believe that having the Caprice available would assist Cole's defense and thus no basis upon which to argue for an adverse inference. Given these circumstances, the state court's rejection of Cole's ineffective assistance claim was not unreasonable.

**D.    Amendment of indictment**

Cole's final federal claim is that he was denied due process and equal protection when the trial court allowed the prosecution to amend the attempted murder charge

against him to allege that he shot "at" Larry Turentine, rather than that he shot Larry

"about the body." Respondent contends that Cole procedurally defaulted this claim by

failing to fairly present it to the state courts as a federal claim and alternatively that the

claim fails on its merits.

### 1. Procedural default

"Fair presentment requires the petitioner to give the state courts a meaningful

opportunity to pass upon the substance of the claims later presented in federal court."

*Boyko v. Parke*, 259 F.3d 781, 788 (7th Cir. 2001). Even if Cole himself did not fairly

present the claim as a federal issue, however, "a state court's decision to raise and

answer a constitutional question *sua sponte* will also permit subsequent federal habeas

review." *Cooper v. Wainwright*, 807 F.2d 881, 887 (11th Cir. 1986); *see also Johnson v.

Cain*, 712 F.3d 227, 231 (5th Cir. 2013); *Walton v. Caspari*, 916 F.2d 1352, 1357–58

(8th Cir. 1990) (exhaustion requirement satisfied if state court undertook to decide

petitioner's constitutional claim on the merits *sua sponte*).

Respondent is correct that Cole did not cite to any federal precedent in his

appellate brief on direct appeal, nor did he expressly argue that the amendment of the

indictment violated his federal constitutional rights. Rather, he relied on an Illinois

statute, 725 ILCS 5/111-5, and two cases decided by the Illinois Appellate Court:

*People v. Kelly*, 299 Ill. App. 3d 222, 701 N.E.2d 114 (1998), and *People v. Patterson*,

267 Ill. App. 3d 933, 642 N.E.2d 866 (1994).

The state appellate court's decision, however, arguably did address the federal

constitutional aspect of Cole's claim. In discussing the claim, the Illinois Appellate Court

noted that "[w]hat matters is that the amended version [of the indictment] still conveys

the gist of the offense charged so that the defendant was adequately informed by the indictment." Ex. A at 17 (internal quotation marks omitted). It ultimately concluded that the amendment to the indictment did not enlarge the crime and that Cole "was adequately informed of the charge . . . both before and after the amendment." *Id.* In support, the court cited to three of its prior decisions, including *People v. Dunskus*, 282 Ill. App. 3d 912, 668 N.E.2d 1138 (1996). In *Dunskus*, the Illinois Appellate Court noted that a defendant has a constitutional right "to be informed of the nature and cause of the charge against [him]." *Id.* at 915, 668 N.E.2d at 1141. The court further explained that the Illinois legislature gave that fundamental right "substance" when it enacted section 111-3(a) of the Illinois Code of Criminal Procedure of 1963, which sets forth the requirements for a state criminal charge. *Dunskus*, 282 Ill. App. 3d at 915, 688 N.E.2d at 1141. The court's citation to *Dunskus* in addressing Cole's claim suggests that it was aware of the federal constitutional dimension of his argument regarding the amendment of the indictment. The court's conclusion that Cole was adequately notified of the charges also calls to mind the strictures imposed by due process—that the defendant "be advised of the charges against him, [and] have a reasonable opportunity to meet them by way of defense or explanation . . . ." *In re Oliver*, 333 U.S. 257, 275 (1948); *cf. Johnson v. Williams*, 133 S. Ct. 1088, 1096 (2013) ("[I]f the state-law rule subsumes the federal standard—that is, if it is at least as protective as the federal standard—then the federal claim may be regarded as having been adjudicated on the merits."). Because it appears that the state court did adjudicate the substance of Cole's federal due process claim, this Court may appropriately consider the merits of that claim.

## 2. The merits

It is important to note at the outset the limited nature of Cole's federal claim regarding the amendment of the indictment. Although the Fifth Amendment provides for a right to an indictment by a grand jury "for a capital, or otherwise infamous crime," U.S. Const. amend. V, the Supreme Court has declined to apply the grand jury requirement to the states. *See Alexander v. Louisiana*, 405 U.S. 625, 633 (1972); *Hurtado v. California*, 110 U.S. 516, 534–35 (1884). Instead, Cole's claim invokes the requirements of due process: a right to reasonable notice of the charge and an opportunity to be heard in defense of that charge. *In re Oliver*, 333 U.S. at 273; *see also Cole v. Arkansas*, 333 U.S. 196, 201 (1948) ("It is as much a violation of due process to send an accused to prison following conviction of a charge on which he was never tried as it would be convict him upon a charge that was never made.").

To comply with the requirements of due process, the court must provide a defendant with notice that "set[s] forth the alleged misconduct with particularity." *In re Gault*, 387 U.S. 1, 33 (1967). An amendment to an indictment or other charging document is permissible if the original indictment reasonably informed the defendant of the "substantial elements of the crime" for which he was ultimately convicted. *Paterno v. Lyons*, 334 U.S. 314, 321 (1948).

The Illinois Appellate Court concluded that the amendment to the indictment that the trial court permitted was a matter of formality and not substantive because "[t]he crime was not enlarged and the defendant was adequately informed of the charge in count XIX, both before and after the amendment." Ex. A at 17. This was a reasonable conclusion. The indictment for attempted murder identified the crime charged, the alleged victim, and the method by which Cole allegedly committed the offense. The

amendment did not change any of the elements of the attempted murder charge and did not expand or alter the scope of the charge. As such, the trial court did not violate Cole's right to due process when it allowed the prosecution to amend the indictment shortly before the trial began. Cole is not entitled to relief on this claim.

### E.     Certificate of appealability

When a district court enters a final judgment that dismisses a prisoner's habeas corpus petition, it must issue or deny a certificate of appealability (COA). "[F]ederal courts of appeals lack jurisdiction to rule on the merits of appeals from habeas petitioners" in the absence of a COA. *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). To obtain a COA, the petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A court should issue a COA if it determines that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks omitted).

The Court's determination that the Illinois Appellate Court reasonably adjudicated all of the claims in Cole's habeas corpus petition (aside from the claims that Cole has now agreed are non-cognizable) is not fairly debatable. The Court therefore declines to issue a certificate of appealability.

## Conclusion

For the reasons stated above, the Court denies Cole's petition for a writ of habeas corpus and declines to issue a certificate of appealability. The Clerk is directed

to enter judgment in favor of the respondent.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  May 28, 2013